CLARENCE M. ALLRED, JUNE ALLRED, J. LAWRENCE APPLE, ELLA APPLE, LAWRENCE E. BACH, UNITA BACH, PHILIP BLANK, JR., MARY ALICE BLANK, GLENN W. BOWERS, FLORA LEE BOWERS, BENJAMIN E. BRITT, JOY BRITT, ROBERT S. BRYAN, GERALDINE BRYAN, JOHN A. CARBONE, JEAN CARBONE, BRUCE K. CHESTER, MARGARET CHESTER, ELLIS COWLING, BETSY COWLING, LAWRENCE E. CRABTREE, VIRGINIA CRABTREE, RALPH E. FORREST, LULA D. FORREST, L. E. HANSBROUGH, FREDA HANSBROUGH, WARREN HANSON, HARRIETT HANSON, SOLOMON P. HERSH, ROSALIE HERSH, Z. ZIMMERMAN HUGUS, NANCY HUGUS, JOHN E. JOHNSON, LOIS JOHNSON, MAX LEVINE, PHYLLIS LEVINE, CARL LOWENDICK, MARY LOWENDICK, JAMES B. LYLE, SHIRLEY LYLE, HERBERT MARTIN, MARY MARTIN, EDMUND MENDELL, LOIS MENDELL, LATHAM L. MILLER, FRANCES MILLER, FLOYD MORGAN, ANN MORGAN, WILLIAM D. PAGE, PEGGY PAGE, LEE PERSON, HELEN PERSON, NORMAN PLINER, ROSALYN PLINER, THOMAS H. REGAN, NANCY REGAN, JAMES R. REID, MARJORIE REID, ROBERT T. ROSS, MARTHA ROSS, SAMUEL C. SCHLITZKUS, BOBBIE M. SCHLITZKUS, BERNIE SILVERMAN, FAYE SILVERMAN, W. B. SLOOP, VONNIE SMITH, SYLVIA SMITH, JOHN W. STONE, BETSY STONE, ROBERT WAHL, GERALDINE WAHL, LEWIS P. WATSON, MIRANDA WATSON, J. C. WILLIAMSON, JR., SALLIE JOE WILLIAMSON, CHARLES C. WOOTEN, AND RUTH WOOTEN, ON BEHALF OF THEMSELVES AND OTHER NEARBY PROPERTY OWNERS, PLAINTIFFS v. THE CITY OF RALEIGH, NORTH CAROLINA, TRAVIS H. TOMLINSON, MAYOR AND MEMBER OF THE CITY COUNCIL OF THE CITY OF RALEIGH, NORTH CAROLINA, AND GEORGE B. CHERRY, SEBY B. JONES, WILLIAM M. LAW, CLARENCE E. LIGHTNER, ALTON L. STRICKLAND, AND WILLIAM H. WORTH, MEMBERS OF THE CITY COUNCIL OF RALEIGH, NORTH CAROLINA, AND BLUE RIDGE GARDENS, INC., DEFENDANTS
— AND —
SEBY B. JONES, MAYOR OF THE CITY OF RALEIGH, NORTH CAROLINA, AND JESSE O. SANDERSON, THOMAS W. BRADSHAW, JR., AND ROBERT W. SHOFFNER, MEMBERS OF THE CITY COUNCIL OF THE CITY OF RALEIGH, NORTH CAROLINA, ADDITIONAL DEFENDANTS

No. 11

(Filed 20 January 1971)

1. **Municipal Corporations § 30— rezoning ordinance — presumption of validity**
   A duly adopted rezoning ordinance is presumed to be valid.

2. **Municipal Corporations § 30— facts pertinent to validity of rezoning ordinance — question of fact for superior court**
   Controversies in respect of facts pertinent to the validity of a rezoning ordinance present questions of fact for determination by the superior court judge.

Allred v. City of Raleigh

3. **Municipal Corporations § 30— delegation of zoning power to municipalities**

While the original zoning power of the State reposes in the General Assembly, it has delegated this power to the "legislative body" of municipal corporations. G.S. 160-172 *et seq.*

4. **Municipal Corporations § 30— power to zone — limitations of enabling act**

The power of the legislative body of a municipality to zone is subject to the limitations of the enabling act, and within the limits of the powers so delegated, the municipality exercises the police power of the State.

5. **Municipal Corporations § 30— recommendations of planning board — effect**

A municipal planning board has no legislative, judicial or quasi-judicial power, and its zoning recommendations do not restrict or otherwise affect the legislative power of the city council. G.S. 160-22; G.S. 160-177.

6. **Municipal Corporations § 30— power to enact comprehensive zoning ordinance**

The City Council of Raleigh had the power to enact a comprehensive zoning ordinance.

7. **Municipal Corporations § 30— Raleigh zoning ordinance — essentials of comprehensive zoning ordinance**

The zoning ordinance of the City of Raleigh complies with two of the essentials of a comprehensive zoning ordinance, *viz.*: (1) It applies to all territory subject to the zoning jurisdiction of the city council, and (2) all uses permissible in a particular district or zone are available as of right to the owner of property within such district or zone.

8. **Municipal Corporations § 30— zoning — applicability of restrictions to all areas in same classification**

All areas in each zoning classification must be subject to the same restrictions.

9. **Municipal Corporations § 30— rezoning to less restrictive classification — action based on specific plans of applicant — failure to find property should be made available for all uses permitted by new classification**

Municipal ordinance rezoning a 9.26-acre tract of land from one residential classification to a less restrictive residential classification is invalid where the city council did not determine that the 9.26-acre tract and the existing circumstances justified rezoning the tract so as to permit *all* uses permissible under the new classification, but the city council's action was based on its approval of the specific plans of the applicant to construct on the 9.26-acre tract luxury apartments in twin-rise towers.

10. **Municipal Corporations § 30— authority to rezone — limitations**

A municipal legislative body has authority to rezone property when reasonably necessary to do so in the interests of the public

health, safety, morals or welfare, the only limitation upon this authority ordinarily being that it may not be exercised arbitrarily or capriciously.

**11. Municipal Corporations § 30— disregard of fundamental concepts of zoning — arbitrary and capricious action**

Notwithstanding the motivation of the members of the city council may be laudable, any action of the council that disregards the fundamental concepts of zoning as set forth in the enabling legislation may be arbitrary and capricious.

**12. Municipal Corporations § 30— rezoning to less restrictive classification — necessity for finding that property should be made available for all uses permitted by new classification**

The zoning of a tract of land may be changed from the residential classification R-4 to the less restrictive residential classification of R-10 only if and when its location and the surrounding circumstances are such that the property should be made available for all uses permitted in the R-10 district.

**13. Municipal Corporations § 30— rezoning — assurance that tract will be developed according to restricted approved plan.**

Rezoning on consideration of assurances that a particular tract or parcel will be developed in accordance with restricted approved plans is not a permissible ground for placing the property in a zone where restrictions of the nature prescribed are not otherwise required or contemplated.

APPEAL by plaintiffs from the Court of Appeals.

Plaintiffs' action is for a declaratory judgment. They seek an adjudication that Ordinance No. 764-ZC-69, referred to hereafter as the Ordinance, which was adopted by the unanimous vote of the City Council at its meeting on March 3, 1969, is invalid and void.

The Ordinance provides:

"Section 1. That the Zoning Ordinance of the City of Raleigh, being Chapter 24 of the City Code and including the Zoning District Map, which is a part of said ordinance, is hereby amended as follows:

"Southwest corner of the intersection of Glen Eden Drive and the Beltline, being Lot No. 28, according to Wake County Tax Map 434, containing approximately 9.26 acres, rezoned to Residential 10 District.

"Section 2. That this ordinance shall become effective twenty days after date of publication."

Plaintiffs alleged, in twenty-two paragraphs, various grounds on which they attack the Ordinance. Separate answers filed by defendant Blue Ridge Gardens, Inc., and by defendant officials, assert the validity of the Ordinance.

When the case came on for hearing at October 1969 Regular Civil Session, Wake Superior Court, Judge Bailey stated: "There will be no jury trial." (Note: Although plaintiffs excepted, their exception is not brought forward on appeal.) Thereafter, evidence was offered by plaintiffs and by defendants, the evidence consisting of testimony, documentary evidence and maps.

Uncontradicted evidence tends to show the facts narrated below.

The 9.26-acre tract referred to in the Ordinance fronts 859.7 feet on the south side of Glen Eden Drive (formerly Nathan Drive) and extends south along the western right-of-way of the Beltline. Its west line extends south to a depth of 408 feet and its east line extends south along the western line of the right-of-way of the Beltline to a depth of 570 feet. The west line is the city limit. The maps in evidence indicate the length of the south (back) line is approximately the same as that of the north (front) line.

The Beltline, with a total right-of-way width of 260 feet, is a limited access highway of four lanes with a dividing median. It carries traffic for U. S. Highways Nos. 1, 70 and 64.

Glen Eden Drive crosses the Beltline on a bridge. There is no means of interchange or access between Glen Eden Drive and the Beltline. Glen Eden Drive affords the only means of travel between the 9.26-acre tract and points east and west of where it crosses the Beltline.

The Glen Eden Drive right-of-way is eighty feet wide. The paved portion of Glen Eden Drive is thirty-nine feet wide. On March 3, 1969, when the Ordinance was adopted, the paved portion of Glen Eden Drive west of the Beltline stopped at the City limits.

The 9.26-acre tract was annexed to and became a part of the City of Raleigh in 1966. Pursuant to authority conferred by Chapter 540, Session Laws of 1949, and G.S. 160-181.2, Section 3 of Chapter 24 of the Raleigh Code, a comprehensive zoning

ordinance, provides: "(F) or the purpose of promoting the health, safety, morals and general welfare of citizens of the city and of the territory and community beyond and surrounding the corporate limits of the city *for a distance of one mile in all directions,* the city council does hereby extend this chapter and the zoning ordinances, together with all amendments thereto, to that area beyond and surrounding the corporate limits of the city for a distance of one mile in all directions; and the area beyond and surrounding the corporate limits of the city *for a distance of one (1) mile in all directions* is divided into classes of districts shown on the zoning maps which are on file in the city planning office, and are hereby declared to be a part of this chapter." (Our italics.)

The zoning map in evidence is dated August, 1966. It consists of four separate sheets, the 9.26-acre tract and surrounding areas appearing on Sheet 1.

According to the zoning map:

Large areas, on both sides of Glen Eden Drive, extending east from the Beltline to Ridge Road and beyond, are zoned R-4. The homes of all plaintiffs, except those referred to below, are located in these areas east of the Beltline. The record before us does not show the exact location (other than the street address) of the property of any of the plaintiffs except that of plaintiff Floyd Morgan, whose home is at the southeast corner of Glen Eden Drive and the Beltline, that is, directly across the Beltline from the 9.26-acre tract.

Large areas lying north, west, southwest and (a smaller area) directly south of the 9.26-acre tract are zoned R-4. The area to the north includes a restricted residential development known as Eden Croft, part of which lies directly across Glen Eden Drive from the 9.26-acre tract. Areas north, northwest, west and southwest of the 9.26-acre tract include portions which are beyond the present city limits but within one mile thereof and therefore subject to the zoning jurisdiction of the City Council. It was stipulated that the properties of plaintiffs Blank and of plaintiffs Regan are located on Arbor Drive and Eden Croft Drive, respectively; but the stipulation does not disclose the location of these properties within the Eden Croft Subdivision.

According to the zoning map offered by plaintiffs and the marked aerial photograph offered by defendants, an area zoned R-4, of substantial but undefined dimensions, separates the 9.26-acre tract and an area located at the northwest corner of the *interchange* intersection of Lake Boone Trail and the Beltline.

It was stipulated that the neighborhood in which plaintiffs' properties are located "is a quiet, orderly neighborhood, useful and being used as a high class residential area." Photographs of the homes of about two-thirds of plaintiffs evidence this stipulated fact.

The 9.26-acre tract was conveyed to Blue Ridge Gardens, Inc., referred to hereafter as the corporate defendant, by deed dated March 16, 1965, from Ezra Meir and wife, Violet S. Meir, and J. McCree Smith and wife, Lucille T. Smith, at which time the 9.26-acre tract was zoned R-4.

On May 24, 1965, the corporate defendant filed an application, requesting that the zoning of the property be changed from R-4 to Shopping Center. The applicant proposed a large ten-story apartment building with a shopping center on the first floor. The Raleigh Planning Commission (Planning Commission), to which the application was referred, voted unanimously to recommend to the City Council that the application be denied for the following reasons: "1. The surrounding neighborhood was almost unanimous in its objection to the change from single family residential, believing that such a change in the plan would have a detrimental effect on their properties. A sufficient petition to require a ¾ vote to *(sic)* the Council was submitted. 2. The Commission did not believe that a change in the plan was warranted at this time, recognizing the neighborhood objection and possible encouragement of such a use to instigate further zoning changes around this intersection." As recommended by the Planning Commission, the City Council denied this application.

On July 24, 1967, the corporate defendant filed a *second* application, requesting that the zoning of the property be changed from R-4 to R-10. The applicant proposed the use of this property "for apartment-type dwellings." The Planning Commission, to which the application was referred, recommended that the application be denied for the following reasons: " (I)t would constitute spot zoning; . . . it does not have direct access to the Beltline; and request was not in keeping with the rest of the area." As

recommended by the Planning Commission, the City Council by unanimous vote at its meeting on August 21, 1967, denied the application.

On December 16, 1968, a *third* application was filed. This application, which was filed by Ezra Meir, requested that the zoning of the property be changed from R-4 to R-10. (Note: Mr. Meir is president of the corporate defendant and he and his wife are the only stockholders.) On January 15, 1969, the City Council, meeting jointly with the Planning Commission, held a public hearing with reference to this third application. The minutes of this meeting disclose: On behalf of the applicant, Mr. Anderson, a planning consultant, presented "a development study of the project, to be called Blue Ridge Gardens, and explained their plans to build luxury apartments in a vertical manner to provide for 10 families per acre in twin high-rise towers." Also, Mr. Anderson "read a letter from the Chamber of Commerce, by W. H. Simonds, endorsing the project." A petition signed by sixty-nine persons in the Glen Eden area, "opposing the rezoning on the basis the establishment of an apartment project on the property would seriously interfere with the use and enjoyment of their property and diminish its value," was presented by Mr. Hunter, their counsel, and some 10-12 persons stood in support of the opposition. The application was referred to the Planning Commission with the understanding that Mr. Bailey, counsel for the applicant, would be permitted to submit his contentions in writing. (Note: Mr. Bailey was unable to present his contentions at the meeting on account of a conflicting engagement as a member of the Rules Committee of the General Assembly.) Later, contentions in favor of the proponents and opponents were submitted in writing by Mr. Bailey and by Mr. Hunter, respectively.

On January 20, 1969, it was reported to the City Council that the Planning Commission had deferred the application for further study.

On February 11, 1969, the Planning Commission adopted the following "Report to the City Council."

"This was the application by Ezra Meir for the rezoning of a tract of land on the Beltline at Glen Eden Drive for R-10 which would allow the construction of two very attractive high-rise apartment buildings. The Commission has discussed this case

on three occasions since the hearing and has at the Council's instruction reviewed written statements submitted by attorneys representing both sides.

"The Commission would first like to admit that it recognizes the potential economic and aesthetic benefits of such a project to the City of Raleigh. We agree with the applicant that such apartments, and particularly such an outstanding architectural project, would be of great benefit to the community, and it was frankly difficult for us to keep foremost in our minds the more important aspects of comprehensive planning and community-wide benefits.

"There are many sites in our community on which such a project could be placed under either existing zoning or under zoning changes which would comply with our planning principles and ideals. The proposed area has none of these planning reasons for a change.

"We have allowed higher density areas to develop adjacent to the Beltline but only in areas where access was more or less directly to and from interchanges. This area does not have that access.

"This action would very definitely constitute spot zoning in that we would be zoning one man's property for a specific proposed use to the detriment of surrounding areas.

"We cannot look only at this proposal and its possible effects on the community. If this high density residential is allowed, there will surely be other requests in the immediate vicinity which can offer the same arguments, and, therefore, should reasonably also be allowed. We should not change our plan to allow this.

"If we were to recommend this with the opinion that we do not believe it would be detrimental to the area, we are substituting our judgment for 69 residents who live in the area and believe such a use would be detrimental through their submission of a petition. Although we admit that neighborhoods do not always think comprehensively in their petitions, we admit this community presentation was very reasonably and soundly based on planning principles which we endorse.

"Again we repeat our enthusiasm for such a project and

would sincerely encourage the applicant to seek another site for its accomplishment.

"The Planning Commission voted unanimously to recommend to the City Council that this application be denied."

At a meeting held February 17, 1969, the City Council, after hearing the report of the Planning Commission, decided to refer the matter for consideration by the Council "as a committee of the whole" at a called meeting. The meeting of the City Council for this purpose was held on February 24, 1969. The minutes of this meeting disclose that, in addition to the members of the City Council, members of the Planning Commission, to wit, Mr. Ivey, Mr. Lortz, Mr. Stanton and Mr. Williams were present. The minutes of this meeting are quoted below.

"L. L. Ivey, chairman of the City Planning Commission, was recognized and reiterated the recommendations of the Commission made at the February 17, 1969 Council meeting. He stated high density areas have been allowed on the Beltline but this location does not have access, and if allowed there will be other requests in the immediate vicinity, which may offer the same reasons for rezoning and should be allowed. He called attention to the petition in protest signed by 69 residents. He said most commission members viewed the plans with favor and liked the design and concept, and it was sometimes difficult to keep planning principles uppermost in their minds, and felt that Raleigh needs such apartments but the Commission would encourage that they seek other sites for location of the project.

"The applicant, Ezra Meir, and his attorney, Ruffin Bailey, were present. Answering a question posed by Councilman Cherry, Mr. Bailey said he had analyzed the petition and of the 69 signatures a total of 37 are actually property owners, and some 5-600 yards away from the immediate neighborhood. He presented a statement signed by owners of property on the same side of the Beltline as the property in question, Billy B. Waters, Eva M. Waters, and J. R. Adams, supporting the request for rezoning to Residential 10 in order that the project may be constructed at the location requested, and also presented a written statement from Charles W. Gaddy, owner of property across the street from the property in question, in which Mr. Gaddy said he did not personally object to the particular project. Mr. Bailey said the applicant has made commitments and cannot sell out and go elsewhere, and because of its nature the apartments must be in

a residential area. Mr. Meir, in answer to a question, assured the Council he plans to go ahead with the project as presented as this has been a dream of his for a long time.

"Discussion centered around the proposed luxury type apartments, possible comprehensive planning for Glen Eden Drive between Beltline and Blue Ridge Road, the undeveloped areas around the property in question, possibility of applicant no (t) building the apartments as planned, and generation of traffic on Glen Eden Drive. After hearing Council members and members of the City Planning Commission express themselves, Mr. Lightner made a motion that approval of the request for rezoning to Residential 10 be recommended to the full Council to afford the community the opportunity of this splendid development, which was seconded by Mr. Worth and passed unanimously on roll call vote."

The minutes of the meeting of the City Council held March 3, 1969, at which the Ordinance was adopted by unanimous vote, include the following: "It was generally agreed that there will be more of the type of apartment complexes planned for this area if the city is to maintain its growth, and there should be some type of protective measure such as site plan approval, etc., to provide the city with some control. The city attorney advised that this would require an ordinance amendment and take 60 to 90 days to enact such an ordinance because of required legal procedures for advertising for any change in the zoning ordinance and publication of the ordinance after approval. In response to questions by the Council, Attorney Ruffin Bailey, representing the applicant, stated that a 60 to 90 day delay would materially affect the project because they have a concept that is new and the first one for Raleigh and construction must start immediately. He assured the Council that the apartments as outlined would be built by his client, and stated that they would voluntarily submit for approval their plans and specifications."

Upon seventeen separately stated findings of fact and four separately stated conclusions of law set forth therein, Judge Bailey "ORDERED, ADJUDGED AND DECREED that (the) Ordinance . . . was adopted in accordance with law and is valid; that the plaintiffs are not entitled to the relief prayed for in the complaint; and that the costs of this action should be taxed by the Clerk against the plaintiffs."

Plaintiffs excepted and appealed to the Court of Appeals. In their appeal, they set forth the fifty assignments of error appearing on pages 192-256 of the record.

The Court of Appeals, by a two to one decision of the hearing panel, affirmed the judgment of Judge Bailey. 7 N.C. App. 602, 173 S.E. 2d 533. One member of the panel having dissented, plaintiffs' appeal to the Supreme Court is of right under G.S. 7A-30(2).

*John V. Hunter III, for plaintiff appellants.*

*Donald L. Smith and Broxie J. Nelson for defendant appellee City of Raleigh.*

*Bailey, Dixon, Wooten & McDonald, by J. Ruffin Bailey, Wright F. Dixon, Jr., and John N. Fountain for defendant appellee Blue Ridge Gardens, Inc.*

BOBBITT, Chief Justice.

Plaintiffs alleged no procedural irregularity in the adoption of the Ordinance. They attack it, *inter alia*, on the ground it exceeds and conflicts with the authority conferred by the enabling legislation.

[1, 2] A duly adopted rezoning ordinance is presumed to be valid. Controversies in respect of facts pertinent to its validity present questions of fact for determination by the superior court judge. *Zopfi v. City of Wilmington*, 273 N.C. 430, 438, 160 S.E. 2d 325, 333. Here, the evidence discloses no conflicts as to essential facts.

[3, 4] The original zoning power of the State reposes in the General Assembly. *Marren v. Gamble*, 237 N.C. 680, 75 S.E. 2d 880. It has delegated this power to the "legislative body" of municipal corporations. G.S. 160-172 *et seq.; In re Markham*, 259 N.C. 566, 131 S.E. 2d 329, and cases cited. The power to zone, conferred upon the "legislative body" of a municipality, is subject to the limitations of the enabling act. *Marren v. Gamble, supra; State v. Owen*, 242 N.C. 525, 88 S.E. 2d 832. Within the limits of the powers so delegated, the municipality exercises the police power of the State. *Raleigh v. Fisher*, 232 N.C. 629, 61 S.E. 2d 897.

G.S. 160-172, in pertinent part, provides: "For the purpose of promoting health, safety, morals or the general welfare of the community, the legislative body of cities and incorporated towns is hereby empowered to regulate and restrict the height, number of stories and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts and other open spaces, the density of population, and the location and the use of buildings, structures and land for trade, industry, residence or other purposes."

G.S. 160-173 provides: "For any or all said purposes it may divide the municipality into districts of such number, shape and area as may be deemed best suited to carry out the purposes of this article; and within such districts it may regulate and restrict the erection, construction, reconstruction, alteration, repair or use of buildings, structures or land. *All such regulations shall be uniform for each class or kind of building throughout each district,* but the regulations in one district may differ from those in other districts." (Our italics.)

G.S. 160-174 provides: *"Such regulations shall be made in accordance with a comprehensive plan* and designed to lessen congestion in the streets; to secure safety from fire, panic and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population; to facilitate the adequate provision of transportation, water, sewerage, schools, parks and other public requirements. Such regulations shall be made with reasonable consideration, among other things, as to the character of the district and its peculiar suitability for particular uses, and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such municipality." (Our italics.)

G.S. 160-175, in pertinent part, provides: "The legislative body of such municipality shall provide for the manner in which such regulations and restrictions and the boundaries of such districts shall be determined, established and enforced, and from time to time amended, supplemented or changed."

G.S. 160-176, in pertinent part, provides: "Such regulations, restrictions and boundaries may from time to time be amended, supplemented, changed, modified or repealed."

[5] G.S. 160-22 and G.S. 160-177 provide for the appointment of a planning board (commission). This board (commission) has no legislative, judicial or quasi-judicial power. Its recommendations do not restrict or otherwise affect the legislative power of the "legislative body," *i.e.*, the city council. *In re Markham, supra* at 571, 131 S.E. 2d at 334.

G.S. 160-178 authorizes the appointment of a board of adjustment whose powers include the following: "Where there are practical difficulties or unnecessary hardships in the way of carrying out the strict letter of such ordinance, the board of adjustment shall have the power, in passing upon appeals, to vary or modify any of the regulations or provisions of such ordinance relating to the use, construction or alteration of buildings or structures or the use of land, so that the spirit of the ordinance shall be observed, public safety and welfare secured and substantial justice done." Decisions relating to hardship variances by a board of adjustment are not germane to the question before us. Here, we are concerned with rezoning, not with variances within a particular zone.

The provisions of the charter of the City of Raleigh which confer authority in respect of zoning and which provide, *inter alia*, for a City Planning Commission are in accord with the provisions of the cited General Statutes.

[6] The cited General Statutes and the charter of the City of Raleigh confer upon the City Council of Raleigh legislative power to enact *a comprehensive zoning ordinance*. The validity of comprehensive zoning ordinances has been recognized by the Supreme Court of the United States and by this Court. *Euclid v. Amber Realty Company*, 272 U.S. 365, 71 L. Ed. 303, 47 S.Ct. 114, 54 A.L.R. 1016 (1926); *In re Appeal of Parker*, 214 N.C. 51, 55, 197 S.E. 706, 709; *In re O'Neal*, 243 N.C. 714, 719, 92 S.E. 2d 189, 192, and cases cited.

Section 1 of Chapter 24 of the Raleigh Code, a comprehensive zoning ordinance, provides: "It is deemed necessary in order to preserve and promote the health, comfort, convenience, good order, better government, safety and morals, and in order to promote the systematic future development of the city, the economic and industrial prosperity, prevent or relieve congestion, either of population or traffic, control the fire hazard, preserve the natural and historic features of the city and beautify the same, to divide the city into districts or zones and to make regu-

lations therefor in accordance with a comprehensive plan for the use and development of all parts of the city, designed to insure a fair and adequate division of light and air among buildings, protect the residence districts, conserve property values, facilitate adequate provisions of water, sewerage, schools, parks, and other public requirements, and to encourage the most appropriate use of land throughout the city."

For the purposes set forth in Section 1, Section 4 divides the city into thirteen classes of districts or zones, inclusive of five residential districts or zones designated R-4, R-6, R-10, R-20 and R-30.

In R-4, the permitted structures for residential use are restricted to "single-family dwelling unit(s)" with this exception: "Townhouse developments and unit-ownership developments," as defined elsewhere in the Ordinance, are permitted "when approved as planned unit developments of fifty (50) acres or more under Chapter 20 of this Code."

In R-6, the permitted uses include all uses permitted in R-4. Additional permitted uses in R-6 include "(t)wo (2) family dwelling, multi-family dwelling, townhouses or apartment houses, each on its own lot, fronting on a public street, provided no dwelling shall contain more than eight (8) units on any one (1) story"; "(g)roup housing developments and apartment projects which comply with section 24-42"; and "(h)ospital, sanitarium, rest home, home for the aged provided that such use shall exclude the insane, feebleminded, or chronic alcoholic."

In R-10, the permitted uses include all uses permitted in R-6. Additional uses (subject to specified restrictions) permitted in R-10 include "(a) customary home occupation incidental to the occupancy of the home as a dwelling, carried on by a resident in his own home"; a "(r)ooming house, boarding house or tourist home"; and "(c)lub for civic purposes operated by a civic organization, including offices for local, state and regional officials."

In R-20, the permitted uses include all uses permitted in R-10 and in addition thereto a "(s)ocial fraternity, sorority."

In R-30, the permitted uses are the same as those permitted in R-20. These permitted uses, with the addition of "(s)ocial fraternity, sorority," are the same as the uses permitted in R-10.

Hence, with the indicated exception, R-10 is the least restricted of the residential zones.

[7, 8] We refrain from attempting an all-inclusive definition of a "comprehensive" zoning ordinance. Suffice to say, the Raleigh Zoning Ordinance complies with two of the essentials of a comprehensive zoning ordinance, *viz.*: (1) It applies to all territory subject to the zoning jurisdiction of the City Council, including the area beyond and surrounding the corporate limits of the city for a distance of one mile in all directions; and (2), with reference to property within a particular district or zone, *e.g.*, R-10, *all* uses permissible in R-10 are available as of right to the owner. "(W)hen the classification has been made, all the areas in each class must be subject to the same restrictions. G.S. 160-173." *Walker v. Elkin,* 254 N.C. 85, 88, 118 S.E. 2d 1, 3.

The record discloses no evidence or contention before the City Council or before the court that the 9.26-acre tract was unsuitable for development for the uses permissible in R-4. In *Walker v. Elkin, supra* at 88, 118 S.E. 2d at 4, there was a finding, amply supported by competent evidence, that the 3.56-acre tract there involved was not suitable for residential development. In *Zopfi v. City of Wilmington, supra* at 437, 160 S.E. 2d at 332, the evidence amply supported the conclusion that the rezoned property was not best suited for the construction of single family residences. Here, the minutes disclose affirmatively that the City Council based its decision to change the zoning of the 9.26-acre tract from R-4 to R-10 on other grounds.

As recently as August 21, 1967, the City Council, as recommended by the Planning Commission, had denied the corporate defendant's application that the zoning of the 9.26-acre tract be changed from R-4 to R-10. Notwithstanding, on March 3, 1969, the City Council, rejecting the *recommendation* of the Planning Commission, adopted the Ordinance.

[9] Consideration of the minutes of the Planning Commission and of the City Council show beyond doubt that the City Council did not determine that the 9.26-acre tract and the existing circumstances justified the rezoning of the 9.26-acre tract so as to permit *all* uses permissible in an R-10 district. On the contrary, it appears clearly that the ground on which the City Council based its action was its approval of the specific plans of the applicant to construct on the 9.26-acre tract "luxury apart-

ments . . . in twin high-rise towers." We assume the City Council was fully justified in accepting the assurances of the appplicant that the 9.26-acre tract would be developed in accordance with the particular and impressive plans submitted to the Planning Commission and to the City Council. However, " (i) n enacting a zoning ordinance, a municipality is engaged in legislating and not in contracting." *Marren v. Gamble, supra* at 684, 75 S.E. 2d at 883, and cases cited; *McKinney v. High Point,* 239 N.C. 232, 237, 79 S.E. 2d 730, 734; *Zopfi v. City of Wilmington, supra* at 434, 160 S.E. 2d at 330-331. Without suggesting that the particular applicant would not keep faith with the City Council, if the zoning is changed from R-4 to R-10 the owner of the 9.26-acre tract will be legally entitled to make any use thereof permissible in an R-10 zone.

[10, 11] Unquestionably, Raleigh's "legislative body," namely, its City Council, has authority to rezone property when reasonably necessary to do so in the interests of the public health, the public safety, the public morals or the public welfare. Ordinarily, the only limitation upon this legislative authority is that it may not be exercised arbitrarily or capriciously. *Walker v. Elkin, supra* at 89, 118 S.E. 2d at 4. However, notwithstanding the motivation of the members of the City Council may be laudable, any action of the City Council that disregards the fundamental concepts of zoning as set forth in the enabling legislation may be arbitrary and capricious.

[12, 13] In our view, and we so hold, the zoning of the property may be changed from R-4 to R-10 only if and when its location and the surrounding circumstances are such that the property should be made available for all uses permitted in an R-10 district. Rezoning on consideration of assurances that a particular tract or parcel will be developed in accordance with restricted approved plans is not a permissible ground for placing the property in a zone where restrictions of the nature prescribed are not otherwise required or contemplated. Rezoning must be effected by the exercise of legislative power rather than by special arrangements with the owner of a particular tract or parcel of land.

In *Oury v. Greany,* _____ R.I. _____, 267 A. 2d 700 (1970), a similar factual situation was considered. The Town Council of North Kingstown, Rhode Island, acting upon an application that the zoning of a 7.32-acre tract be changed from residential

to business "D" adopted a resolution which provided: " . . . IT WAS VOTED that the change of zone on the petition of Timothy J. Greany . . . be granted. FURTHER VOTED that the property be re-zoned to the present zoning if this specified car sales building is not built." In affirming a superior court judgment, which granted injunctive relief on the ground the purported rezoning was invalid, the Supreme Court of Rhode Island said: "No extended argument is required to demonstrate that the rezoning of residential property to a business use on the condition that the land rezoned shall be devoted exclusively to the business use for which application to rezone was made, or otherwise remain residential, constitutes zoning without regard to the public health, safety and welfare, concern for which is basic to that comprehensiveness contemplated in the enabling act."

The findings of fact on which the superior court judge based his judgment, except (1) and (2), are quoted in the opinion of the Court of Appeals. (1) and (2) relate to jurisdiction and to the location of the 9.26-acre tract, respectively. Evidential facts included in these findings are incomplete in the respects indicated in our statement of facts.

Upon the evidence before him, the superior court judge reached the conclusion that the Ordinance "bears a reasonable and substantial relation to the public safety, health, morals, comfort and general welfare and makes adequate provision for transportation without undue concentration of population." Presumably, the court was of opinion that the evidence was sufficient to justify a finding that the 9.26-acre tract should be rezoned so as to make it available for all uses permissible in an R-10 zone. As to this, we express no opinion. However, no legislative power vests in the court. Legislative power vests in the City Council. If the City Council should determine upon further consideration that the circumstances justify a rezoning of the 9.26-acre tract or similarly situated property so as to make these properties available for use for all purposes permitted in an R-10 zone, different questions will be presented.

[9] For the reasons indicated, we hold the Ordinance invalid and unenforceable.

Accordingly, the decision of the Court of Appeals is reversed, and the cause is remanded to the Court of Appeals with direction that it enter an order vacating the judgment of the

superior court and directing that the superior court enter judgment declaring the Ordinance invalid and unenforceable.

Reversed and remanded.